**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

NATALIE DEMERS,                                  )
                                                 )          CIVIL ACTION NO.
                    Plaintiff,                   )
v.                                               )
                                                 )
INTERNATIONAL COALITION OF                       )
GIRLS' SCHOOLS, INC.                             )
                    Defendant.                   )          JANUARY 20, 2026

## <u>NOTICE OF REMOVAL</u>

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF CONNECTICUT:

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant, International Coalition of Girls'

Schools, Inc. (hereinafter "Defendant"), hereby removes this action from the Superior Court of

the State of Connecticut, Judicial District of Hartford at Hartford, to the United States District

Court for the District of Connecticut.  This court has jurisdiction over this case under 28 U.S.C.

§1332 (Diversity of Citizenship). The facts pertinent to this Notice of Removal include the

following:

1.  Plaintiff brought an action against Defendant in the Superior Court of the State of

    Connecticut, Judicial District of Hartford at Hartford. The Plaintiff's return of service

    filed in the state court action states that service was made on the Defendant pursuant to

    Connecticut General Statutes § 33-929(b) by depositing a copy of the summons and

    complaint at the post office in West Hartford, Connecticut, on December 23, 2025,

    certified mail, return receipt requested, addressed to "The Secretary, International

Coalition of Girls' Schools, Inc., 300 Garrison Forrest Road, Owings Mills, MD 21117" and to "William C. Trimble, Esq., 250 W. Pratt Street, Baltimore, MD 21201." Under General Statutes § 33-929(b), if this constituted effective service, then service is considered effective under these circumstances five days after its deposit in the United States mail, meaning service would be considered effected on December 28, 2025.

2. The Plaintiff also emailed a courtesy copy of the Summons and Complaint to Defendant's attorney on December 23, 2025. The Defendant first received a copy of the Summons and Complaint on December 26, 2025. A copy of the Summons and Complaint is attached hereto as **Exhibit A**.

3. There is complete diversity of citizenship between the parties to this suit and the sum in controversy, exclusive of costs and interest, exceeds $75,000.00.  This Notice of Removal is timely as it has been filed within 30 days of the date upon which Defendant received the Summons and Complaint in this matter.

4. As set forth in the Summons and as alleged in its Complaint, the Plaintiff is an individual who is a resident/citizen of Connecticut.

5. Defendant is a corporation incorporated in the state of Maryland, with its principal place of business located in Charlottesville, Virginia. Defendant is a citizen of Maryland and Virginia.

6. The Plaintiff has filed a Complaint against the Defendant alleging a disability discrimination claim pursuant to the Connecticut Fair Employment Practices Act ("CFEPA") (Connecticut General Statutes § 46a-60), and a retaliation claim pursuant to CFEPA, Connecticut General Statutes § 46a-60(4).

7. In her Complaint, the Plaintiff alleges she was discriminated against and terminated by her former employer, the Defendant.

8. Plaintiff has informed Defendant that Plaintiff seeks damages for losses sustained in an amount in excess of $75,000.00.

9. The United States District Court for the District of Connecticut has jurisdiction over this case pursuant to 28 U.S.C. §1332, in that there is complete diversity of citizenship between the proper parties to this suit and the amount in controversy, exclusive of costs, interest and attorneys' fees, exceeds the sum of $75,000.00.

10. Concurrent with the filing of this Notice of Removal, the Defendant is serving this Notice of Removal upon the Plaintiff, and is filing a copy of the Notice of Removal with the Clerk of the Superior Court, Judicial District of Hartford at Hartford.

WHEREFORE, the Defendant respectfully requests that this Court accept jurisdiction of the above-identified action now removed from the Superior Court, Judicial District of Hartford at Hartford, to the United States District Court for the District of Connecticut, and enter any other relief as may be necessary or appropriate.

DEFENDANT,
**INTERNATIONAL COALITION OF GIRLS' SCHOOLS, INC.**

BY___*/s/ Deborah Etlinger (ct 02877)*___

Deborah Etlinger (ct 02877)
Erin Canalia (Ct 30489)
NEUBERT, PEPE & MONTEITH, P.C.
750 Main Street, Suite 200
Hartford, CT 06103
Phone 860.548.1122 | Fax 860.548.1223
detlinger@npmlaw.com
ecanalia@npmlaw.com

NEUBERT, PEPE & MONTEITH, P.C.
750 MAIN STREET, HARTFORD, CT 06103-3598
PHONE NO. (860) 548-1122; FAX NO. (860) 548-1223
JURIS NO. 440923

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

In addition, I hereby certify that a copy of the foregoing has been sent, via email and U.S. Mail, postage pre-paid, to the following parties/counsel of record on January 20, 2026.

Jacques J. Parenteau
Madsen, Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
jparenteau@mppjustice.com
(representing Plaintiff)

/s/ Deborah Etlinger (ct 02877)
Deborah Etlinger
Erin E. Canalia

NEUBERT, PEPE & MONTEITH, P.C.
750 MAIN STREET, HARTFORD, CT 06103-3598
PHONE NO. (860) 548-1122; FAX NO. (860) 548-1223
JURIS NO. 440923

EXHIBIT A

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-25
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact the Centralized ADA Office at 860-706-5310 or go to: www.jud.ct.gov/ADA/ |
|---|

STATE OF CONNECTICUT
JUDICIAL BRANCH
**SUPERIOR COURT**
*www.jud.ct.gov*



**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| **95 Washington Street, Hartford, CT 06103** | ( 860 ) 548 − 2700 | 1/27/2026 |

| ☒ Judicial District | G.A. | At *(City/Town)* | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | ☐ Number: | **Hartford** | Major: **M** | Minor: **90** |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| **Madsen, Prestley & Parenteau, LLC, 105 Huntington Street, New London, CT 06320** | 418345 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 860 ) 442 − 2466 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case. Any attorney who is not exempt from e-filing is required to accept electronic delivery. (Practice Book Section 10-13) ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book jparenteau@mppjustice.com |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: **DEMERS, NATALIE** Address: **50 Long View Drive, Simsbury, CT 06070** | P-01 |
| **Additional plaintiff** | Name: Address: | P-02 |
| **First defendant** | Name: **INTERNATIONAL COALITION OF GIRLS' SCHOOLS, INC.** Address: **300 Garrison Forrest Road, Owings Mills, MD 21117** | D-01 |
| **Additional defendant** | Name: **AND c/o William C. Trimble, Esq., its last known agent for service, 250 W.Pratt Street,** Address: **Baltimore, MD 21201** | D-02 |
| **Additional defendant** | Name: Address: | D-03 |
| **Additional defendant** | Name: Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court | Name of person signing |
|---|---|---|---|
| 12/22/25 | | ☐ _____ Clerk | **Jacques J. Parenteau** |

| If this summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts. | File Date |
| b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law. | |
| c. The court staff is not permitted to give any legal advice in connection with any lawsuit. | |
| d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

Print Form | Page 1 of 2 | Reset Form

## STATE OF CONNECTICUT

**RETURN DATE: JANUARY 27, 2026**                    **SUPERIOR COURT**

**NATALIE DEMERS,**                                :
                                                   :
    **vs.**                     :            **JUDICIAL DISTRICT OF**
                                                   :            **HARTFORD**
**INTERNATIONAL COALITION OF**                     :
**GIRLS' SCHOOLS, INC.**                           :            **DECEMBER 22, 2025**
                                                   :

### COMPLAINT

**COUNT ONE:**    **DISABILITY DISCRIMINATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT CONN. GEN. STAT. § 46a-60**

1. Plaintiff Natalie Demers is an individual who resides at 50 Long View Drive, Simsbury, Connecticut.

2. Defendant, International Coalition of Girls' Schools, Inc., is a corporation with a principal place of business located at 300 Garrison Forrest Road, Owings Mills, Maryland, and a mailing address of P.O Box 5729, Charlottesville, Virginia. Defendant is organized under the laws of the State of Maryland but is not currently in good standing according to the State Of Maryland. Defendant is an employer as that term is defined under the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statutes § 46a-51(10).

3. At all times relevant to this Complaint, Plaintiff worked for Defendant from her home in Simsbury, Connecticut.

4. Plaintiff is a disabled person within the meaning of the CFEPA, Connecticut General Statutes § 46a-51(20). Specifically, Plaintiff suffers from Major Depressive Disorder ("MDD"), Generalized Anxiety Disorder ("GAD") and Post

Traumatic Stress Disorder ("PTSD"), all conditions that appear in the Diagnostic and Statistical Manual of Mental Disorders.

5. On or about August 23, 2024, Plaintiff filed a complaint with the Connecticut Commission on Human Rights & Opportunities ("CHRO") and the Equal Employment Opportunity Commission.

6. The CHRO issued a release of jurisdiction on October 23, 2025.

**Plaintiff's Successful Employment with Defendant Prior to Medical Leave**

7. On or about March 7, 2018, an offer letter for the position of Director of Research Initiatives and Programs with the National Coalition of Girls' Schools, Defendant's previous name, was emailed to Plaintiff. Plaintiff signed the offer letter in the state of Connecticut and returned the signed offer letter to Defendant via email.

8. On or about July 2, 2018, Plaintiff completed all employment paperwork for Defendant, signed in the State of Connecticut, and commenced her employment with Defendant in the full-time position of Director of Research Initiatives and Programs.

9. Defendant's vision states "We are united in elevating women's leadership worldwide by educating and empowering our students to be ethical, globally minded change makers." And one of Defendant's principles is "Leadership & Integrity: We inspire the next generation of informal global citizens to lead with courage, competence, and empathy."

10. In the position of Director of Research Initiatives and Programs, Plaintiff reported to Executive Director, Megan Murphy.

11. Throughout her employment with Defendant, Plaintiff competently and diligently performed her job duties and responsibilities.

12. In January 2019, Plaintiff launched the first Global Action Research Collaborative ("GARC") on Girls' Education cohort. GARC was a program Plaintiff designed and developed based on her research, including input from the International Boys School Coalition action research program.

13. In June 2021, the NCGS Board voted to transition the organization into a global coalition and Megan Murphy changed her title to Global Executive Director.

**Additional job duties and increased workload**

14. In August 2021, the Director of Strategic Communication and Media resigned from her position with NCGS.

15. Despite stressing the importance of having a Director of Communications, filling the position was delayed. As a result, the job duties of the Director of Communications became the responsibility of the rest of the team of directors, including Plaintiff.

16. In January 2022, Defendant hired Kathleen Osbourne to the position of Director of Communications.

17. At this time however, the focus of Defendant was the repositioning of the organization from national to international, therefore most of the support work from the Director of Communications position stayed with Plaintiff and the other team members while Ms. Osbourne worked closely with Ms. Murphy on the global transition.

18. In June 2022, the official transition from National to International Coalition of Girls' Schools occurred.

19. In the fall of 2022, the Association of State Girls' Schools merged with Defendant.

20. In January 2023, the Director of Strategic Initiatives and Professional Development, Jennifer Evers, made the decision to leave her employment with Defendant, although she stayed on as a consultant with Defendant through June 2023.

21. In or around March 2023, it was decided that rather than replace the position, the job duties of Director of Strategic Initiatives and Professional Development would be split between Plaintiff and Ms. Osbourne.

22. As part of this reassignment, it was agreed that additional staff would be hired to take on aspects of Plaintiff's job duties for her to perform the additional duties and responsibilities of the Director of Strategic Initiatives and Professional Development position.

23. As a result, new job descriptions were prepared for Plaintiff, Ms. Osbourne, and the potential new hires. Plaintiff and Ms. Osbourne collaborated in creating their new job descriptions as well as those for the new hires which were then approved by Ms. Murphy.

24. In April 2023, Plaintiff's job title was changed to Director of Research Initiatives and Professional Learning, which included the additional job duties and responsibilities.

25. The official offer letter for the position of Director of Research Initiatives and Professional Learning was emailed to Plaintiff on or about April 3, 2023, the date of the letter. Plaintiff signed the offer letter on April 6, 2023, in Connecticut and returned the signed copy to Defendant via email. The title change was effective June 1, 2023.

26. From April 2023 through June 2023, two director level members of Defendant were out of the office, one on medical leave and one on maternity leave, making use of the short-term disability policy as Defendant did not have a maternity leave policy.  With Ms. Evers also leaving her position, Plaintiff and Ms. Osbourne were left as the only full-time team members with Defendant. This meant every program responsibility was now theirs, resulting in Plaintiff and Ms. Osbourne working three other jobs in addition to their own full-time workloads.

27. In June 2023, Ms. Evers concluded her consulting position with Defendant.

28. At the same time in June 2023, Defendant was working on merging with the Alliance of Girls' Schools Australasia ("Alliance") whose Director of Communications had recently quit.

29. As a result, much of the responsibilities of Alliance's Director of Communications needed to be incorporated into the job descriptions for the potential new hires of Defendant who would be responsible for the portions of Plaintiff's duties she was supposed to be relieved of upon the hire of new employees.

30. With additional duties to be added for potential new hires, the job descriptions needed to be rewritten. Therefore, there was a pause in hiring the additional staff

and Plaintiff was now covering the equivalent of two full-time positions with no additional help.

31. In the summer of 2023, Ms. Murphy spent four weeks traveling through Australia and New Zealand with Trudy Hall, Ms. Murphy's friend who was acting as a "consultant," to meet with heads of schools in preparation for the merger with Alliance.

32. As a result, Plaintiff and Ms. Osbourne were required to cover the office during this time while Ms. Murphy traveled and was completely absent from the office.

33. Following Ms. Murphy's return, in addition to Plaintiff's already increased responsibilities, Plaintiff had to oversee and onboard the GARC Coordinator, Debbie Hill.

34. Ms. Hill would take over some aspects of Plaintiff's responsibilities, however, at the same time, a key GARC team member was stepping back from her role. As a result, those responsibilities were also being incorporated into Plaintiff's and Ms. Hill's roles.

35. Instead of reducing Plaintiff workload, the changes ended up adding to the duties Plaintiff was required to perform.

36. Also in the summer of 2023, the employee who was on medical leave returned to work full time. Immediately upon her return, Ms. Murphy gave the returning employee an extremely negative annual review who had never received a negative review prior to this one.

37. Ms. Murphy also criticized the returning employee for being late and not staying on top of her responsibilities. The returning employee was late because of

medical appointments and had a lighter workload because of a serious medical condition, all of which Ms. Murphy was aware of as part of the medical leave she had approved.

38. On or about September 1, 2023, Plaintiff asked Ms. Murphy about her annual review. Ms. Murphy indicated she was too busy to write the review, but she was happy with Plaintiff's work and accomplishments over the previous year. During this meeting, Plaintiff mentioned her concerns about the onerous workload.

39. In the summer and fall of 2023, separate from the position description redesign, Plaintiff was taking on a massive project in overhauling and redoing the research library while combining it with the extensive Alliance research library.

40. This project was extraordinarily time-consuming and was met with many delays which were out of Plaintiff's control.

41. Plaintiff kept Ms. Murphy updated on the status of the projects, but Ms. Murphy kept shifting priorities, which became incredibly stressful and unsettling for Plaintiff. This constant shifting caused Plaintiff to work through the entire Christmas holiday break.

42. In addition to the research library, Plaintiff was also tasked with developing an online course for teachers who were newly hired to the girls' schools.

43. This course was previously run by another organization under a profit-sharing agreement but concluded to bring it in house to Defendant.

44. To meet the needs of both Northern and Southern Hemisphere schools, as well as academic timelines, Plaintiff had to create two versions of the course.

45. While Plaintiff had the expertise to build the course, she did not have the staff or time to do so.

46. At the same time, Plaintiff had started working on the symposiums and conference programming duties she took on from Ms. Evers' position.

47. The UK Symposium occurred in October 2023 and was an enormous success.

48. Subsequently, Plaintiff was again required to assist with additional tasks outside of her job description. Ms. Osbourne asked Plaintiff to join her in prospective partner and sponsor meetings requiring Plaintiff to review all proposals and plans.

49. These meetings became increasingly frequent and prevented Plaintiff from working on other tasks she was now responsible for based on the position realignment.

50. Plaintiff did not need to attend these meetings, however Ms. Murphy insisted Plaintiff be part of the conversations.

**Increased stress and exacerbation of symptoms of depression and anxiety**

51. By late fall 2023, the workload added to Plaintiff's initial responsibilities, combined with significant delays in hiring additional staff, caused Plaintiff to feel extremely overworked and overwhelmed.

52. With the overload of work, time zone differences with international communications, stress, and lack of time for all her responsibilities, Plaintiff was working throughout all hours of the day and night.

53. Plaintiff addressed these concerns with Ms. Murphy, who simply responded it would get better.

54. The additional workload also took a physical toll on Plaintiff, including effect of the increased keyboard time that caused numbness and intense pain in both wrists.

55. By December 2023, Plaintiff had consistently kept Ms. Murphy updated on projects and specifically noted that she was trying to balance the extraordinary workload but was struggling with her mental health and well-being.

56. Plaintiff's symptoms of depression and anxiety were increasing as the work environment became more difficult to keep up with due to the overload of responsibilities.

57. In December 2023, Plaintiff informed Ms. Murphy that she was burning out, she was concerned about her health, and she was struggling with workload and pace and asked Ms. Murphy to clearly outline what projects were priority so she could focus on specific tasks.

58. In January 2024, Plaintiff reiterated to Ms. Murphy the need for the additional staff Defendant agreed to hire the previous year when she took on the new role.

59. In doing so, Plaintiff pointed out all the tasks she was performing that were not part of her job responsibilities.

60. With full knowledge that Plaintiff was running the upcoming LA Symposium and that a significant part of what Plaintiff loved about her work was traveling and meeting teachers, Ms. Murphy responded that Plaintiff should not go to the LA Symposium.

61. Ms. Murphy's response was a clear threat to Plaintiff that if she raised concerns, she would be punished.

62. In January 2024, the new research library project was finally complete and was met with much celebration and appreciation externally, however Plaintiff received little acknowledgement internally.

63. Plaintiff was also starting to build the program for the June 2024 ICGS annual conference, a three-day event.

64. Plaintiff had never organized this conference before as it was a portion of Ms. Evers' responsibilities that Plaintiff acquired. Plaintiff did not receive training on organizing this event prior to Ms. Evers' departure. Given her lack of training, Ms. Murphy said she would meet with Plaintiff in LA when they were there for the Symposium and work with Plaintiff on organizing the conference.

65. As with the UK Symposium, the February LA Symposium was a tremendous success.

66. While in LA, Ms. Murphy failed to meet with Plaintiff as planned, despite being fully aware of the stress Plaintiff was under.

67. As a result, Plaintiff developed a process for organizing the conference based on the successful processes she used in organizing the UK and LA Symposiums.

68. After approximately two weeks being solely focused on the conference, Plaintiff met with Ms. Murphy and Ms. Osbourne to review what she had done.

69. Ms. Murphy, after failing to train Plaintiff as promised, immediately criticized Plaintiff's process, told her she was doing it all wrong, and instructed her to redo everything.

70. The response from Ms. Murphy was a breaking point for Plaintiff, which had a serious impact on Plaintiff's mental health.

71. By this time, Plaintiff had been in multiple meetings with Ms. Murphy where Plaintiff stated she was struggling, that things needed to change, and that Defendant needed to hire additional staff. Ms. Murphy never took these concerns seriously and often turned to conversation into how busy work was for Ms. Murphy.

72. On March 8, 2024, Plaintiff met with Ms. Murphy once again and reiterated her serious concerns about the additional responsibilities that were added to her job duties and reminded Ms. Murphy that she had raised these concerns several times in the past with no change or needed assistance.

73. Recognizing the severity of the impact on her mental health, Plaintiff was direct and clear with Ms. Murphy and stated she was not well, she was struggling, she was completely overwhelmed, burnt out, not healthy, and most specifically that her mental health was suffering.

74. Ms. Murphy's response was defensive, unsupportive, and critical of Plaintiff, even blaming Plaintiff for her current mental state. Ms. Murphy then stated that she had been in worse situations and Plaintiff would get over it.

75. Following this meeting, Plaintiff's symptoms of depression and anxiety became overwhelming, and Plaintiff went into acute distress requiring medical intervention.

**Plaintiff's Medical Leave of Absence for Mental Health**

76. Plaintiff's medical providers were aware of the work environment that exacerbated her conditions and with the significant downturn in her mental health, Plaintiff was advised to seek an immediate medical leave of absence.

77. On March 11, 2024, Plaintiff attended a follow-up meeting with Ms. Murphy. It was not until this time that Ms. Murphy offered to redistribute Plaintiff's responsibilities so she could focus on vital tasks.

78. Plaintiff then again reiterated her concerns, specifically stating that she did not want to let anyone down, but she "hit a wall" and needed to focus on her mental health.

79. Plaintiff subsequently inquired with Paige Rannigan, Director of Finance and Operations, about short-term disability ("STD") and Family and Medical Leave ("FMLA") and advised Ms. Rannigan of her need to take a medical leave of absence for mental health reasons.

80. On March 12, 2024, Plaintiff informed Ms. Murphy that given the negative impact on her mental health, Plaintiff's medical provider recommended she take leave under the FMLA.

81. Plaintiff then followed up with Ms. Rannigan regarding the requirements and process for applying for medical leave. Ms. Rannigan however, erroneously informed Plaintiff that she would receive full pay while on medical leave with the combination of Connecticut Paid Leave and STD.

82. Plaintiff developed a leave plan and arranged coverage for her job duties and responsibilities, which covered the entire 12 weeks of leave allotted by STD.

83. Plaintiff met with each team member in preparation for her leave and had handover meetings with Ms. Murphy as point person for GARC and Laura Blackenship, a friend of Ms. Murphy, as point person for the online course. Ms.

Murphy, however, later handed GARC over to Ms. Hall, a friend of Ms. Murphy who was not an employee of Defendant.

84. On March 14, 2024, Plaintiff commenced her medical leave of absence for mental health disability which qualified as a reasonable accommodation to allow Plaintiff to treat her mental health disability and allow Plaintiff to return to work within a definite 12 week time frame dictated by the length of an FMLA leave Defendant agreed to use as a measure of the length of the leave.

85. On March 15, 2024, Plaintiff completed the Short-Term Disability Claim Statement for the short-term disability carrier and listed the type of condition as an illness and described as "anxiety and depression."

86. Plaintiff's short term disability leave was eventually approved through May 31, 2024.

87. The process of applying for and receiving short term disability benefits and Connecticut paid leave was challenging and further exacerbated Plaintiff's mental health medical conditions.

88. There was a delay in receiving benefits, delays from Defendant with paperwork to the State, and discrepancies in the amount of pay Plaintiff received.

89. After significant follow up communication, Plaintiff learned in mid-May, two months into her leave, that she had been misinformed by Defendant prior to taking leave when she was told she would be paid in full while on leave.

90. Contrary to what Defendant told her; Plaintiff would not be receiving full pay. Rather, the STD insurance carrier would pay a percentage of Plaintiff's pay and any amount she received from CT Paid leave would be deducted from the

amount paid by the STD carrier. This was a significantly lower amount than Plaintiff's regular pay and what she was told she would receive.

91. Had Plaintiff been correctly informed by Defendant from the start, she could have, and would have, structured the leave differently and used the time to heal.

92. Instead, the leave process and now financial burden further exacerbated her mental health conditions.

93. Prior to taking the medical leave to address mental health issues, Plaintiff saw an orthopedic doctor regarding the numbness and pain in her wrists from the increased workload and was sent for testing.

94. In a follow-up orthopedic appointment after commencing her medical leave, Plaintiff was diagnosed with bilateral carpal tunnel syndrome and it was determined that Plaintiff would undergo endoscopic carpal tunnel release surgery on both wrists, which were scheduled for April 22, 2024, and May 6, 2024.

95. These surgeries were unrelated to Plaintiff's current, approved leave of absence for mental health reasons and Plaintiff never sought a medical leave for carpal tunnel syndrome surgeries. Rather, Plaintiff underwent these procedures while already on leave having Defendant's best interest in mind in resolving this issue while already out of work on leave.

96. Ms. Murphy was aware that Plaintiff underwent the surgeries while on her medical leave of absence for mental health.

97. On May 15, 2024, while on medical leave, Ms. Murphy advised Plaintiff that a former Board member, Genevieve Madigan, had taken on the role of Chief Finance and Operations Director of Defendant. Ms. Murphy also advised Plaintiff

that Ms. Madigan had been in touch with the STD carrier and would contact Plaintiff.

98. While awaiting communication from Ms. Madigan, Plaintiff was advised by her surgeon that she was cleared to work following her second surgery and could return to work on June 6, 2024, a date slightly after the expiration of Plaintiff's medical leave for mental health.

99. Plaintiff immediately informed Ms. Murphy of the June 6, 2024 clearance date. Since the delay in returning to work was unrelated to the approved leave to address mental health issues, Plaintiff asked to use sick time for the three days following the expiration of her FMLA leave and prior to her clearance date from surgery.

100.    On May 22, 2024, Ms. Madigan contacted Plaintiff to set up a meeting, which Plaintiff understood to be about insurance based on Ms. Murphy's communications.

101.    After scheduling the phone call, Ms. Madigan informed Plaintiff that Ms. Murphy would be joining the call as well, which triggered concerns of retaliation by Plaintiff.

**Plaintiff's Return to Work from Medical Leave**

102.    The telephonic meeting occurred on May 24, 2024, and had nothing to do with insurance payments, but rather Plaintiff's return to work.

103.    During the meeting, Ms. Murphy was rude, abrupt, and dismissive towards Plaintiff.

104.     Despite being aware of Plaintiff's June 6, 2024 clearance date, Ms.

Murphy began the conversation by stating that she had arranged coverage until

the end of June 2024 for Plaintiff's position, a timeframe that included the annual

conference, a significant time for Defendant and also for the GARC program.

105.     Plaintiff was scheduled to run a 3-day training for over sixty educators

from around the world which included the incoming cohort for the GARC program

as well as the "graduating" cohort. Both cohorts received training and the

graduating cohort present their research findings, which occur during the annual

conference. Plaintiff had seven (7) volunteers reporting to her who had worked

together for years on this program and training prior to the annual conferences.

Plaintiff was expected to be in attendance by all those involved.

106.     In addition, during the conference itself, Plaintiff was scheduled to present

with a close professional partner organization on a research study she had been

working on for over a year.

107.     Plaintiff was an integral part of the annual conference and had been

working on the training and was in communication with colleagues regarding the

program for a significant period of time prior to her medical leave.

108.     Ms. Murphy informed Plaintiff that Plaintiff would not be attending the

annual conference in June 2024 and those who covered the program in her

absence should be celebrated.

109.     Plaintiff built the GARC program, collaborated with the team for four (4)

years and with the teachers in the graduating cohort for 18 months. Ms. Hall

covered the program for approximately 12 weeks in Plaintiff's absence and Plaintiff was now told that Ms. Hall would be honored for her work.

110.    In addition, Plaintiff was not allowed to attend the team retreat that followed the June 2024 annual conference. Both the conference and retreat had always been key aspects of Plaintiff's job.

111.    The June 2024 conference is the only point in the year that the coalition gathers, it was a particularly momentous time for Plaintiff's work and professional reputation.

112.    Plaintiff was told that she, along with Karen Burbank, Database Manager, would be supporting the conference remotely.

113.    Neither Plaintiff nor Ms. Burbank were asked to help in any way.

114.    Ms. Burbank was told she could not attend the conference specifically to disguise the fact that Plaintiff had been excluded and that her exclusion was meant as punishment for taking a mental health medical leave of absence.

115.    Ms. Murphy also informed Plaintiff that upon her return to work from medical leave her job title would be changing to Director of Research, and a new job description would be shared with her in the week ahead. Ms. Murphy further informed Plaintiff that going forward, Plaintiff would be reporting to Ms. Madigan instead of Ms. Murphy.

116.    In contrast to all previous changes to Plaintiff's job responsibilities, there was no conversation or collaboration surrounding this change.

117.    On May 30, 2024, Plaintiff received the new Director of Research job description in an email from Ms. Madigan.

118.    The Director of Research job description contained a mere task list with due dates. Plaintiff was stripped of several key duties and responsibilities, and this new job represented a clear demotion.

119.    The GARC program that Plaintiff created was removed from her job duties, there was no information about requirements or objectives for the new position and Plaintiff no longer had any direct reports.

120.    The job description also required Plaintiff to bring in revenue from grants, a job task that Plaintiff had no previous experience performing, which Ms. Murphy knew.

121.    On June 6, 2024, Plaintiff returned to work.

122.    Upon her return, Ms. Murphy had asked Plaintiff to complete several tasks which she did and informed Ms. Murphy of their completion and location.

123.    Plaintiff then met with Ms. Madigan who, in an accusatory manner, questioned Plaintiff about the tasks Ms. Murphy had asked her to complete.

124.    After showing Ms. Madigan where everything was, as she had already told Ms. Murphy, Plaintiff stated this was not a way to welcome someone back from medical leave to treat mental health.

125.    Ms. Madigan responded that Plaintiff had not been away from work on medical leave for mental health issues, but for carpal tunnel surgery.

126.    Plaintiff immediately corrected Ms. Madigan and stated she was in fact out on medical leave for mental health reasons, which Ms. Murphy was aware of, and while out on leave she had surgeries to treat carpal tunnel.

127.    Ms. Madigan then concluded the conversation by informing Plaintiff that
she, Ms. Madigan, would attend every meeting with Plaintiff going forward. This
was said under the guise that Ms. Madigan needed to learn about Plaintiff's
position.

128.    In every meeting thereafter, with team members or external people, Ms.
Madigan sat in the Zoom room watching Plaintiff's performance, an extremely
embarrassing occurrence for Plaintiff after six years of employment with
Defendant.

129.    On or about June 16, 2024, Plaintiff met with Ms. Murphy and Ms.
Madigan to discuss the drastic changes in her job description, specifically why it
changed so much and why she was being demoted after years of excellent work
and reviews.

130.    Plaintiff specifically asked what had changed since she took a medical
leave of absence and asked why she was being punished. Plaintiff also stated
that other colleagues had taken leave, including for childbirth, and were returned
to their positions without issue or retaliation. Ms. Murphy failed to respond to
these concerns, offered no answers, and left the meeting.

131.    After Ms. Murphy's exit, Ms. Madigan encouraged Plaintiff to quit her job,
stating it would be better for Plaintiff, and she could offer Plaintiff a severance
package. Plaintiff refused to quit her job.

132.    On July 1, 2024, Plaintiff met with Ms. Madigan and Ms. Hall to discuss an
audit of the GARC program Ms. Hall had prepared, a copy of which Plaintiff did
not receive until 30 minutes before the meeting.

133.    When Ms. Hall evaluated the program, she did so without anyone knowing she was conducting an audit and without speaking to anyone who knew the program intimately. The audit report was overly critical of the program without context and inaccurate in several areas.

134.    Plaintiff stated there were so many corrections that needed to be made that she would prefer to do it in writing.

135.    During the meeting Plaintiff also described how all the changes to her position impacted her as she prepared to return to work from medical leave for mental health and stated that she did not expect Ms. Hall to understand what it is like to struggle with mental health. Ms. Hall took offense to this statement.

136.    Plaintiff asked why she was being treated this way after being out on medical leave. Plaintiff referenced her mental health issues as being the cause for her medical leave several times during the conversation. Plaintiff also made references to being retaliated against because of her mental health condition and her need to take medical leave.

137.    Plaintiff then offered that Defendant is a mission driven organization elevating women worldwide and advocating for wellbeing, one might expect discrimination based on disability from a large, corporate organization, but not a small non-profit with such a mission. The conversation abruptly ended.

138.    Just two days later, on July 3, 2024, Plaintiff met with Ms. Madigan who informed Plaintiff that her employment was being terminated.

139.     Ms. Madigan initially stated there was no real reason for the termination then stated there was a "misalignment" and no trust to leave Plaintiff to do the work she needed to do.

140.     Ms. Madigan again encouraged Plaintiff to voluntarily resign and gave that option.

141.     Plaintiff again questioned the termination and was told the role was being reimagined and going in a different direction.

142.     Ms. Madigan then stated she had started to prepare a separation agreement the day prior and would send it to Plaintiff for review. She further stated if Plaintiff did not sign the agreement in the 21-day period allotted by the agreement, Plaintiff would not receive a severance payment or vacation pay.

143.     Plaintiff later learned Ms. Madigan and Ms. Murphy falsely claimed to third parties, including the lawyer representing Defendant, that Plaintiff had chosen to leave her employment with Defendant and requested a severance package.

144.     Following the termination of her employment, Ms. Blackenship was hired to fill Plaintiff's role.

145.     Ms. Blackenship is not an individual who suffers from mental health issues and is not a disabled individual under CFEPA.

146.     Following the termination of her employment, Ms. Murphy provided varied reasons to different people on why Plaintiff was no longer employed with Defendant. As Plaintiff was considering the severance package, she remained silent on her sudden departure.

147.    On January 2, 2025, in response to the complaint Plaintiff filed with the Commission on Human Rights & Opportunities, Defendant's lawyer answered the complaint on behalf of Defendant, and, under oath, falsely claimed that Defendant "never received any verbal or written information indicating that the cause of Complainant's leave was due to a mental health disability."

148.    Plaintiff's sudden disappearance and Ms. Murphy's varying stories regarding Plaintiff's departure significantly damaged Plaintiff's reputation and destroyed professional relationships she had built and nurtured for years.

149.    Based on the foregoing, Defendant discriminated against Plaintiff based on her mental health disability in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(1) resulting in adverse employment actions, including but not limited to the demotion she experienced upon return from her medical leave and the termination of her employment shortly thereafter.

150.    As a result of Defendant's discriminatory actions, Plaintiff has suffered damages, including, but not limited to past and future economic and non-economic damages in the form of lost wages and benefits, emotional distress, including exacerbation of pre-existing medical conditions of depression and anxiety, as well as PTSD, and loss of enjoyment of life's activities, and harm to reputation.

151.    As a further result of Defendant's illegal discrimination, Plaintiff has incurred and will continue to incur attorneys' fees and costs.

**COUNT TWO:**    **RETALIATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT CONN. GEN. STAT. §46a - 60(4)**

1 – 148.   Paragraphs 1 through 148 of Count One are incorporated by reference and made paragraphs 1 through 148 of Count Two as though more fully set forth herein.

149.    Based on the foregoing, Defendant retaliated against Plaintiff because she took a medical leave of absence as a reasonable accommodation and because Plaintiff opposed discrimination against her as a person with a mental health disability in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b)(4) resulting in adverse employment actions, including but not limited to the demotion she suffered upon return to work from her medical leave and the termination of her employment shortly thereafter.

149.    As a result of Defendant's illegal discrimination and retaliation Plaintiff has suffered damages, including, but not limited to past and future economic and non-economic damages in the form of lost wages and benefits, emotional distress, including exacerbation of pre-existing medical conditions of depression and anxiety, as well as PTSD, and loss of enjoyment of life's activities, and harm to reputation.

150.    As a further result of Defendant's illegal discrimination, Plaintiff has incurred and will continue to incur attorneys' fees and costs.


**WHEREFORE,** Plaintiff demands a trial by jury on all issues triable to a jury and judgment against the Defendant, and:

1. Economic damages for lost wages and benefits pursuant to Connecticut General Statutes § 46a-104;

2.  Non-Economic damages for emotional distress, including the exacerbation of pre-existing medical conditions of depression and anxiety as well as PTSD, loss of enjoyment of life's activities, and harm to reputation pursuant to Connecticut General Statutes § 46a-104;

3.  Attorneys' fees pursuant to Connecticut General Statutes § 46a-104;

4.  Punitive damages pursuant to Connecticut General Statutes § 46a-104;

5.  Interest pursuant to Connecticut General Statutes §37-3a; and

6.  Such additional equitable relief as may be appropriate in the case.

Dated at New London, Connecticut this 22nd day of December 2025

PLAINTIFF,
NATALIE DEMERS

By:_____
Jacques J. Parenteau, of
Madsen, Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com
Juris No. 418345
Her Attorneys

**STATE OF CONNECTICUT**

**RETURN DATE: JANUARY 27, 2026**            **SUPERIOR COURT**

**NATALIE DEMERS,**                                     :
                                                                      :
   **vs.**                                                       :          **JUDICIAL DISTRICT OF**
                                                                      :          **HARTFORD**
**INTERNATIONAL COALITION OF**          :
**GIRLS' SCHOOLS**                                    :          **DECEMBER 22, 2025**
                                                                      :

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand is greater than $15,000.00, excluding interest and costs.

PLAINTIFF,
NATALIE DEMERS

By: _____
Jacques J. Parenteau, of
Madsen, Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com
Juris No. 418345
Her Attorneys